USCA1 Opinion

 

 February 2, 1993 UNITED STATES COURT OF APPEALS For The First Circuit ____________________ ____________________ No. 92-1435 No. 92-1435 UNITED STATES OF AMERICA, UNITED STATES OF AMERICA, Plaintiff, Appellee, Plaintiff, Appellee, v. v. JEAN M. TAYLOR, JEAN M. TAYLOR, Defendant, Appellant. Defendant, Appellant. ____________________ ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] [Hon. Morton A. Brody, U.S. District Judge] ___________________ ____________________ ____________________ Before Before Selya, Circuit Judge, Selya, Circuit Judge, _____________ Coffin, Senior Circuit Judge, Coffin, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. and Cyr, Circuit Judge. _____________ ____________________ ____________________ Arlene C. Halliday for appellant. Arlene C. Halliday for appellant. __________________ Margaret D. McGaughey, Assistant United States Attorney, with Margaret D. McGaughey, Assistant United States Attorney, with ______________________ whom Richard S. Cohen, United States Attorney, and Timothy C. Wing, whom Richard S. Cohen, United States Attorney, and Timothy C. Wing, ________________ _______________ Assistant United States Attorney, were on brief for appellee. Assistant United States Attorney, were on brief for appellee. ____________________ ____________________ February 2, 1993 February 2, 1993 ____________________ ____________________ CYR, Circuit Judge. Jean Taylor appeals the judgment CYR, Circuit Judge. ______________ of conviction and sentence entered against her on one count of knowingly and intentionally manufacturing marijuana in violation of 21 U.S.C. 841(a)(1), 841(b)(1)(B) and 18 U.S.C. 2. We affirm. A. Probable Cause for Search Warrant A. Probable Cause for Search Warrant _________________________________ On the morning of July 17, 1991, Robert Hutchings, Jr., a special agent of the Maine Bureau of Intergovernmental Drug Enforcement ("BIDE"), spoke with a confidential informant who reported that he recently had visited appellant Taylor and her husband at property in Levant, Maine, upon which the Taylors resided in separate mobile homes. The informant observed several large marijuana plants (up to 4 feet tall) growing in appellant's vegetable garden and around the perimeter of her mobile home, several hundred marijuana seedlings (5 to 6 inches tall) growing in milk cartons and crates and awaiting transplantation to nearby woods, and an "unusual amount" of zip lock storage bags inside appellant's residence. During one visit, appellant told the informant she was concerned because she had started more seed- lings than she could tend. The same day he received the tip from the informant, Agent Hutchings consulted the affidavit submitted in support of a 1986 search warrant application, in which another officer attest- ed that he had purchased marijuana from Taylor on two occasions and personally observed marijuana plants growing on her property. A local drug task force report noted that Taylor had pled guilty to two counts of marijuana trafficking in October 1986. Incorpo- rating this evidence into an affidavit, Hutchings obtained a state court search warrant which was executed later that day. Appellant ultimately was charged in the United States District Court for the District of Maine with manufacturing marijuana in violation of federal law. The district court denied appellant's motion to sup- press the physical evidence (marijuana plants and drug parapher- nalia) based on an alleged absence of probable cause to support the search warrant. Appellant contends that Agent Hutchings' sworn statements vouching for the informant's reliability were conclusory and that the tips provided by the informant were inadequately corroborated. The sufficiency of a search warrant affidavit is appraised against well-established criteria: The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a par- ticular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud- [ing]" that probable cause existed. United States v. Caggiano, 899 F.2d 99, 102 (1st Cir. 1990) ______________ ________ (quoting Illinois v. Gates, 462 U.S. 213, 238-39 (1983)) (cita- ________ _____ tions omitted); see also United States v. Ventresca, 380 U.S. ___ ____ ______________ _________ 102, 108 (1965). The reviewing court does not undertake de novo __ ____ 3 review, but accords "great deference" to the probable cause determination. United States v. Ciampa, 793 F.2d 19, 22 (1st ______________ ______ Cir. 1986) (citation omitted). The Hutchings affidavit tersely attests that the infor- mant "has provided reliable information [to law enforcement officials] in the past." Standing alone, so conclusory a state- ment might not provide an issuing magistrate with the requisite "'substantial basis for concluding that probable cause existed.'" Caggiano, 899 F.2d at 103 (quoting Gates, 462 U.S. at 238-39). ________ _____ On the other hand, an informant's reliability need not invariably be demonstrated through a detailed narration of the information previously furnished to law enforcement for example, by listing the number or names of persons arrested or convicted as a consequence of the informant's prior assistance. Rather, the affidavit may disclose an adequate basis for evaluating the informant's veracity through the very specificity and detail with which it relates the informant's first-hand description of the __________ place to be searched or the items to be seized. Id. at 102-03 ___ (reliability of information enhanced if details derived from informant's personal observation, rather than from hearsay) (citing Ciampa, 793 F.2d at 24). As was the case in Caggiano,1 ______ ________ the informant provided Agent Hutchings with a detailed descrip- tion of the premises to be searched, including the exteriors and ____________________ 1In Caggiano, the informant was a former drug user who ________ provided the names of occupants of the searched premises and the exact dates of his visits. He reported that he observed fire- arms, as well as glassine bags containing white powder which the defendant had said contained cocaine. Caggiano, 899 F.2d at 101. ________ 4 interiors of the Taylor residences, noting in particular the 400 to 500 marijuana seedlings being raised in milk cartons and crates at appellant's residence. Continuing with the "totality of the circumstances" analysis mandated by Gates, we find no merit in appellant's _____ contention that Hutchings conducted an inadequate or superficial follow-up investigation of the informant's tip. On the contrary, Hutchings promptly set out to corroborate the informant's tip by consulting official records relating to appellant's prior convic- tions for marijuana trafficking. These records indicated that appellant, five years earlier, admitted to another police officer that she intentionally cultivated marijuana on the same property, and later entered a guilty plea to a state trafficking charge. An affiant's knowledge of the target's prior criminal activity or record clearly is material to the probable cause determination. See United States v. Asselin, 775 F.2d 445, 446 (1st Cir. 1985); ___ _____________ _______ United States v. Sumpter, 669 F.2d 1215, 1222 (8th Cir. 1982). ______________ _______ Moreover, the issuing magistrate properly may credit the experi- ence and pertinent expertise of a law enforcement affiant in evaluating the authenticity of the informant's description of the target's modus operandi. See United States v. Soule, 908 F.2d ___ _____________ _____ 1032, 1040 (1st Cir. 1990) (citing United States v. Ortiz, 422 _____________ _____ U.S. 891, 897 (1975) ("[O]fficers are entitled to draw reasonable inferences from [] facts in light of their knowledge of the area and their prior experience . . . .")). In the present case, the informant's detailed description of the location, manner and 5 extent of the marijuana cultivation and the presence on the same premises of an unusually large number of zip lock plastic bags, cf. United States v. Desmarais, 938 F.2d 347, 352 (1st Cir. 1991) ___ _____________ _________ (presence of plastic baggies supports reasonable inference of intent to distribute marijuana and hashish found on same premis- es), combined with Agent Hutchings' extensive experience as a law enforcement officer in Maine,2 plainly buttressed the informant- based indicia of probable cause. We accordingly conclude, based on the totality of the circumstances, that the Hutchings affida- vit provided a substantial basis for the issuing judicial offi- cer's practical, common-sense finding that there was a fair prob- ability that evidence of a crime would be found on appellant's premises. B. Admissibility of Pre-Miranda Admissions B. Admissibility of Pre-Miranda Admissions _______________________________________ While a search team executed the warrant, Agent Hutchings arrested appellant and placed her in the back seat of a police vehicle. Hutchings testified that he gave appellant no Miranda warnings because he did not intend to ask her any ques- _______ tions. At some point during the trip to the county jail, appel- lant initiated conversation by asking: "Why is this happening to me?" Hutchings replied: "You can't be growing dope on your property like that." Taylor responded: "If you had waited and come next week, you'd have only gotten half the plants that you ____________________ 2The Hutchings affidavit fully recited his credentials, including his educational training and eleven years of experience in drug-related cases. 6 did[,] the way you do is you pull the male plants early." She added that she was growing the marijuana plants for treatment of a medical condition. As appellant was speaking, Hutchings turned on the overhead light in the vehicle and, without stopping the vehicle, wrote appellant's statements on a pad. Later, during "booking" at the county jail, appellant spontaneously repeated some of these statements to a deputy sheriff. Miranda warnings must be given before a suspect is _______ subjected to "custodial interrogation." United States v. Ma- _____________ ___ guire, 918 F.2d 254, 262 (1st Cir. 1990), cert. denied, 111 S. _____ _____ ______ Ct. 1421 (1991).3 "Interrogation" includes not only the asking of direct questions but also means "any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to ______ ____ ___ __________ ______ __ elicit an incriminating response from the suspect." Rhode Island ______ __ _____________ ________ ____________ v. Innis, 446 U.S. 291, 301 (1980) (emphasis added).4 Since _____ Hutchings' response to appellant's spontaneous inquiry was not interrogative, we must determine whether it nevertheless consti- ____________________ 3The government does not deny that appellant was in "custo- dy" during her conversation with Hutchings. 4Unlike the present case, the issue in Innis was whether the _____ police had initiated "interrogation" after the defendant invoked Miranda. Although the basic test for custodial "interrogation" _______ does not differ in the pre-Miranda context, courts should be _______ particularly alert to the presence of subtle declarations and conduct by the police, such as those challenged in Innis, because _____ an unwarned defendant may be less alert to her rights or to the risks of "volunteered or spontaneous" admissions. 7 tuted the "functional equivalent." Id. at 302.5 ___ Appellant argues that Hutchings intended to elicit an incriminating statement en route to the county jail. As evi- dence, she points to Hutchings' own testimony that suspects often engage in conversation or general banter while being transported to jail. More pointedly, she asserts that, when Hutchings' expectation was confirmed by appellant's inquiry, he deliberately narrowed his response by referring directly to the criminal charge for which appellant had just been arrested. The "functional equivalence" test does not turn on the ____________________ 5The government insists that the district court ruling that the Hutchings response did not constitute custodial "interroga- tion" is subject to "clear error" review only. Normally, "clear error" is the standard employed in reviewing findings of fact. See United States v. Falon, 959 F.2d 1143, 1146-47 (1st Cir. ___ _____________ _____ 1992); United States v. Sanchez, 943 F.2d 110, 112 (1st Cir. _____________ _______ 1991). In the present case, however, none of the relevant facts are in dispute. Hutchings alone testified at the motion hearing, conceding that appellant was not given Miranda warnings and that _______ the in-transit conversation occurred. Thus, the determination as to whether police "interrogation" occurred depends on the totali- ty of the circumstances, a balancing analysis commonly considered amenable to plenary review. See, e.g., United States v. Calisto, ___ ____ _____________ _______ 838 F.2d 711, 717-18 (3d Cir. 1988); United States v. Poole, 794 _____________ _____ F.2d 462, 465 (9th Cir. 1986) (holding that, absent factual dispute, totality test "requires us to 'consider legal concepts in the mix of fact and law and to exercise judgment about the values' underlying the Miranda rule and the fifth amendment") _______ (citation omitted). Indeed, the need for a heightened standard of review seems implicit in some of the seminal "interrogation" cases. See, e.g., Arizona v. Mauro, 481 U.S. 520, 528-29 n.6 ___ ____ _______ _____ (1987) (reversing "interrogation" determination by state supreme court, and challenging dissent's assertion that court improperly disregarded factual findings: "[The] facts of this case do not present a sufficient likelihood of incrimination to satisfy the legal standard articulated in Miranda v. Arizona and in Rhode _____ ________ _______ _______ _____ Island v. Innis.") (emphasis added); Innis, 446 U.S. at 303 ______ _____ _____ (vacating judgment of state supreme court, noting that "[i]t is our view ['of the facts of the present case'], therefore, that ___ ____ the respondent was not subjected [to 'interrogation'].") (empha- sis in original). 8 subjective intent of the particular police officer but on an objective assessment as to whether the police statements and conduct would be perceived as interrogation by a reasonable person in the same circumstances. See Arizona v. Mauro, 481 U.S. ___ _______ _____ 520, 527 (1987); Innis, 446 U.S. at 301-02 n.7; cf. United States _____ ___ _____________ v. Soto, 953 F.2d 263, 265 (6th Cir. 1992) (noting that the ____ "[a]bsence of intent to interrogate, while not irrelevant, is not determinative of whether police conduct constitutes interroga- tion"). Although a different result might obtain were it estab- lished that the challenged police conduct was designed to elicit ________ a response, see United States v. Vazquez, 857 F.2d 857, 863 (1st ___ _____________ _______ Cir. 1988) (quoting Innis, 446 U.S. at 302 n.7), the mere fact _____ that a police officer may be aware that there is a "possibility" that a suspect may make an incriminating statement is insuffi- cient to establish the functional equivalent of interrogation. Mauro, 481 U.S. at 528-29. _____ Hutchings testified that he "might have anticipated that [appellant] would make some sort of statement in response to what [he] said," but because the entire conversation was so abruptly initiated by Taylor, and so transitory, he "wasn't thinking of what her next sentence was going to be or what she was even thinking." Tr. at 38-39. We think Hutchings' conduct indicates no premeditated or deliberate design, but evidences, at most, Hutchings' awareness that appellant might continue the conversation she spontaneously initiated. See, e.g., Innis, 446 ___ ____ _____ U.S. at 303 (noting that police comments were part of "brief 9 conversation" containing "a few offhand remarks"); Plazinich v. _________ Lynaugh, 843 F.2d 836, 840 (5th Cir. 1988) (noting brevity and _______ informality of officer's statement to defendant as evidence of lack of "interrogation"), cert. denied, 488 U.S. 1031 (1989).6 _____ ______ Nor can we agree that Hutchings' answer unresponsively "narrowed" appellant's inquiry, or designedly channeled her attention toward dangerous waters. Viewed objectively, appel- lant's initial inquiry ("Why is this happening to me?") was a direct request for an explanation as to why she was under arrest. ___ ___ ___ _____ ______ Appellant would have us propound a rule that police officers may not answer direct questions, even in the most cursory and respon- sive manner. It might well be argued, however, that an officer's refusal to respond to such a direct question in these circum- stances would be at least as likely to be perceived as having been intended to elicit increasingly inculpatory statements from a disconsolate suspect arrested moments before. Although we do not rule out the possibility that "interrogation" might occur as a consequence of a police officer's response to, or relentless pursuit of, this type of inquiry in other circumstances, cf., ___ e.g., Harryman v. Estelle, 616 F.2d 870, 874 (5th Cir.) (relevant ____ ________ _______ inquiry is whether officer's statement of "surprise," however posed, "could reasonably have had the force of a question") ___ _____ __ _ ________ ____________________ 6Appellant points to the presence of a writing pad in the vehicle, as further evidence of premeditation. The availability of writing materials in a police vehicle is more reasonably explained by the routine demands of law enforcement work. Without more, the presence of these materials formed an insuffi- cient basis for the proposed inference of premeditation. 10 (emphasis added), cert. denied, 449 U.S. 860 (1980), in the _____ ______ present case appellant's inquiry was entirely spontaneous and the officer's answer was cursory and directly responsive. See ___ United States v. Jackson, 863 F.2d 1168, 1172 (4th Cir. 1989) _____________ _______ (finding no "interrogation" where police officer responded to direct inquiry regarding reasons for defendant's arrest, made during conversation initiated by defendant); United States v. ______________ Crisco, 725 F.2d 1228, 1232 (9th Cir.) (holding that police ______ officer's informational response to defendant who expressed general "bewilderment" at arrest was not "interrogation"), cert. _____ denied, 466 U.S. 977 (1984); cf. Arizona v. Roberson, 486 U.S. ______ ___ _______ ________ 675, 687 (1988) (noting that, after defendant invokes Miranda _______ rights, there is no "interrogation" if police merely "inform" defendant about an investigation of a second offense of which he is suspected). We thus conclude that appellant's statement was not the product of custodial interrogation. Miranda v. Arizona, 384 U.S. _______ _______ 436, 478 (1966) ("Volunteered statements of any kind are not barred by the Fifth Amendment . . .").7 C. Rational Basis for Drug Equivalency Ruling C. Rational Basis for Drug Equivalency Ruling __________________________________________ The district court applied the drug equivalency stan- dard prescribed in U.S.S.G. 2D1.1(c): "in the case of an offense involving marijuana plants, if the offense involved 50 or ____________________ 7We note that appellant made substantially the same spon- taneous admissions later at the county jail, even though the "booking" officer posed only routine "booking" questions. 11 more plants, [the court should] treat each plant as the equiva- lent of one kilogram of marijuana." Consequently, appellant was sentenced to ninety-nine months' imprisonment (offense level 28, criminal history category II), based on the 661 marijuana plants seized in and around her residence. Appellant claims that section 2D1.1(c) is arbitrary and without a rational empirical basis; hence its application vio- lates due process. She relies on expert testimony presented in the case of United States v. Osburn, 756 F. Supp. 571 (N.D. Ga. _____________ ______ 1991), to the effect that it is impossible to cultivate a mari- juana plant whose yield would exceed one kilogram of marijuana. We disagree with appellant that the equivalency stan- dard is arbitrary. Congress reasonably may opt for a punitive deterrent against large-scale marijuana manufacturing operations which pose a greater threat than small-scale operations, and warrant exponentially enhanced punishment. See United States v. ___ _____________ McMahon, 935 F.2d 397, 401 (1st Cir. 1991) ("'Congress intended _______ to punish growers of marihuana by the scale or potential of their ___ _____ _________ operation and not just by the weight [or size] of the plants seized at a given moment.'") (citation omitted); see also United ___ ____ ______ States v. Jordan, 964 F.2d 944, 947 (9th Cir. 1992); United ______ ______ ______ States v. Holmes, 961 F.2d 599, 601 (6th Cir. 1992); United ______ ______ ______ States v. Motz, 936 F.2d 1021, 1025-26 (9th Cir. 1991).8 Even ______ ____ ____________________ 8Whatever precedential weight Osburn had was withdrawn on ______ direct appeal. See United States v. Osburn, 955 F.2d 1500 (11th ___ _____________ ______ Cir. 1992). To our knowledge, no other court has held 2D1.1(c) unconstitutional on the empirical ground asserted by appellant. In reversing the district court, the Eleventh Circuit held that 12 were we to conclude, however, that empirical evidence could undermine the constitutionality of 2D1.1, a conclusion we need not consider, appellant not only failed to present evidence in support of such a claim but her borrowed empirical support has vanished.9 The district court's application of U.S.S.G. 2D1.1 did not constitute error. Affirmed. Affirmed ________ ____________________ neither Congress nor the Commission intended the 2D1.1 equiva- lency test as a predictor of the maximum yield of a marijuana plant. Id. at 1507-08. Rather, the actual weight of the con- ___ trolled substance derived from any maturing plant was recognized as largely speculative, whereas a non-equivalency rule would _______________ ____ "reward" a marijuana grower for the mere fortuity that her arrest occurred early in the growing season. Id. at 1506. ___ 9The expert who testified in Osburn conceded later that he ______ had since cultivated a marijuana plant whose actual yield (1152 grams) exceeded the drug equivalency rate adopted in 2D1.1. United States v. Godwin, 779 F. Supp. 561, 565 (N.D. Fla. 1991). _____________ ______ 13