9 F.3d 113
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Gregory Lee MARTIN, Defendant-Appellee.
 No. 93-1678.
 United States Court of Appeals, Seventh Circuit.
 Argued Aug. 4, 1993.
Decided Oct. 25, 1993.
Rehearing Denied Dec. 29, 1993.
 
 Before FLAUM, EASTERBROOK and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 The government appeals, pursuant to 18 U.S.C. 3731, from a district court order suppressing certain statements made by defendant Gregory Lee Martin following his arrest for destroying a building by means of fire (18 U.S.C. Sec. 844(i)).
 
 I. FACTS
 
 2
 David Hayes, an Alton police officer, testified at the hearing on Martin's motion to suppress that a fire at 1414 Highland in Alton, Illinois began in the early morning hours of October 24, 1992. Two firefighters died after being crushed when the building collapsed. Anthony Ventigmilia, another Alton police officer, testified that at 2:00 a.m. that day and again at 4:30 a.m., he spoke with Martin, the building's owner. Ventigmilia also recalled that an Alcohol, Tobacco and Firearms agent spoke with Martin at the police station at 1:40 p.m. that day, at which time Martin refused to undergo a polygraph examination and indicated he wished to speak with an attorney. Martin was not in custody at that time, and in fact left the police station after declining a polygraph.[1] At 3:00 p.m., Lane and Ventigmilia arrived at the home of Martin's girlfriend, and Martin advised her not to speak to the police without having a lawyer present. Martin made no incriminating statements during any of those conversations on October 24.
 
 
 3
 The police began intermittent surveillance of Martin on October 25 or 26. He was aware of the surveillance. At one point, he walked up to the unmarked police car and asked if he had permission to get a hair cut. Martin testified that when he approached the car he told Hayes "that I had contacted my attorney and I had an appointment to go see him the following day or the next day and he said okay, just let me know when I do talk to him and I said okay, and I informed him that I would be going to Brentwood, Missouri to get a hair cut ... and I asked him if there would be any objections to that, and he said no, there wasn't...."
 
 
 4
 Hayes testified that on October 28, 1992, Delaney Gordon, a tenant of Martin's confessed that he had hired him to set fire to the building. Gordon agreed to cooperate by wearing a wire and confronting Martin. (Gordon later testified similarly.)
 
 
 5
 At 10:00 p.m. on October 28, Gordon went to Martin's home and spoke with him. Hayes and other officers monitored the conversation. (At the suppression hearing, the district court admitted this tape-recorded statement after finding it was voluntary.)[2] Gordon then left Martin's home.
 
 
 6
 Hayes testified that at about 10:20 p.m. on October 28, while sitting in a car outside Martin's home, he received a radio dispatch that Martin had telephoned police headquarters and asked that a detective come to his home.[3] Hayes walked up to the front porch, where Martin met him. Hayes said, "[W]e understand that you wanted to talk to us." Martin replied that he "wanted to talk about the fire." Hayes informed him that "it was my understanding that he had previously requested an attorney on one prior contact, and that it would be improper for me to carry on a conversation with him at this point." Hayes then placed Martin under arrest based on the monitored conversation between Martin and Gordon.
 
 
 7
 Hayes testified that at about 10:30 that evening at the police station, as he and Ventigmilia were walking Martin to a cell block, which was in the same hallway as the interview rooms, Martin said that he wanted to speak to them, so they stepped into an interview room with him. Ventigmilia said to Martin, "I assume you called to talk about the fire." Ventigmilia testified: "He said he wanted to make a confession and leave everybody else out of it." Ventigmilia added that Martin first said "he wanted to confess" when they were in the booking room, and then repeated it in the interview room. Hayes testified similarly:
 
 
 8
 Okay, as soon as we got to headquarters, he indicated to Sergeant Ventigmilia and I that he wanted to make a full confession to the fire up on Highland Avenue, but he wanted to leave everyone else out of it, and that he wanted to make a deal, and I stopped him again and told him that since he had already requested a lawyer back on the 24th, that it would be improper for us to talk to him, when at that point he said well that's fine, I will get my lawyer, but I still want to make a confession, and I also request a [court] reporter ... to be present when I confess.
 
 
 9
 Hayes and Ventigmilia cautioned Martin "not to talk to any other law enforcement agent about this case whatsoever." Neither Hayes nor Ventigmilia asked any questions of him.
 
 
 10
 The district court suppressed Martin's statements indicating he wanted to confess, finding they were made before he had been advised of his rights. As an alternative ground, the court found that the statements would be inadmissible because Martin's statements were vague and thus the prejudicial effect of the testimony would far outweigh the probative value.
 
 
 11
 Officer Aaron Geil testified that he photographed and fingerprinted Martin at 12:15 a.m. on October 29, 1992. Martin told Geil: "I hurt a lot of people with this fire, I know I did. I have a lot of respect for firemen, I even wanted to be a fireman at one time."[4] Geil asked him no questions other than his name, address and other booking information. The district court admitted this statement, finding it to be a "true spontaneous statement."
 
 
 12
 Martin testified at the suppression hearing that he had met with an attorney on October 28 before he was taken into custody. During the meeting, the attorney telephoned the police department in his presence. Martin heard only the attorney's side of the conversation, from which he guessed that the "police told him that they were going to come and pick me up." Martin testified that the attorney did not agree to undertake his representation, but that he "agreed to come down there [to the police station] with me and discuss it with me and we would take it from there."
 
 
 13
 Martin testified further that at about 10:17 p.m. on October 28, after Gordon had left his house and after Martin had telephoned the police, Officer Hayes came to the door and arrested him. At the police station, he was taken to a small room, where Ventigmilia said: "I assume you called to talk about the fire." Martin testified that "I asked him would you consider me giving you a confession only if I have one certain reporter from the Post Dispatch present along with my attorney and not get anyone else involved." Ventigmilia said he could not make that decision, and Martin then refused to say anything else.
 
 II. DISCUSSION
 
 14
 The government argues that the district court erred in suppressing Martin's statements to Hayes and Ventigmilia where he indicated he wanted to make a full confession. We agree.
 
 
 15
 There is some dispute as to whether a determination as to whether custodial interrogation occurred should be reviewed de novo or for clear error only.[5] We need not decide the issue here because even under a clearly erroneous standard we find that the district court's decision was incorrect.[6]
 
 
 16
 The district court focused exclusively on whether Martin was given warnings pursuant to Miranda v. Arizona, 384 U.S. 436, 473-74 (1966).[7] Once an accused who is in custody asks for his attorney, however, it makes no difference whether or not Miranda warnings were given. In Edwards v. Arizona, 451 U.S. 477 (1981), the Court held that when a suspect has "expressed his desire to deal with the police only through counsel [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-85.
 
 
 17
 The protections which Miranda warnings provide to counteract the compelling pressures of custodial interrogation are
 
 
 18
 implemented by the application of the Edwards corollary that if a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect.
 
 
 19
 Arizona v. Roberson, 486 U.S. 675, 681 (1988) (citation omitted).
 
 
 20
 The only issue raised by the facts here, then, is whether Martin was subjected to further interrogation by the authorities after he stated that he wanted an attorney. The fact that defendant invoked his right to counsel before the police were required to inform him of that right under Miranda is not relevant. The rule in Edwards is triggered as soon as a defendant expresses a desire for the assistance of an attorney in dealing with custodial interrogation by the police. McNeil v. Wisconsin, 111 S.Ct. 2204, 2209 (1991).
 
 
 21
 We ask, then, whether Martin was faced with interrogation[8] or its "functional equivalent," such that it robbed him of the ability to make a voluntary statement. See Rhode Island v. Innis, 446 U.S. 291 (1980). "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.... Volunteered statements of any kind are not barred by the Fifth Amendment...." Innis, 446 U.S. at 299, quoting Miranda, 440 U.S. at 478. Voluntary statements, of course, are not subject to Miranda warnings. Miranda, 384 U.S. at 478.[9]
 
 
 22
 Who initiated the conversation between the police and the accused plays a significant role in determining whether the suspect's statements were the product of "inherently compelling pressures" or were the "purely voluntary choice of the suspect." Roberson, 486 U.S. at 681. Here, it was the "accused himself [who] initiate[d] further communication, exchanges, or conversations with the police" (Edwards, 451 U.S. at 486, 101 S.Ct. at 1885), when he telephoned the police on the night of October 28, and again when he questioned the officers at the police station later that night.
 
 
 23
 Martin admits that no question was posed to him and that Ventigmilia merely stated, "I assume you called to talk about the fire." Martin testified that he replied: "[W]ould you consider me giving you a confession only if I have one certain reporter from the Post Dispatch present along with my attorney and not get anyone else involved." In fact, Martin himself characterized the exchange as one in which Ventigmilia answered his question, rather than the other way around. Thus, Martin testified:
 
 
 24
 "[Ventigmilia] said that he was aware that I wanted to see my attorney first and couldn't force me to say anything or ask me anything because I did insist on seeing my attorney, and I said okay, I just wanted to ask that question...."
 
 As the Court in Edwards explained:
 
 25
 Had Edwards initiated the meeting ... nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial. The Fifth Amendment right identified in Miranda is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver.
 
 
 26
 Edwards, 451 U.S. at 486-87.
 
 
 27
 There is nothing in the record indicating the police intended to persuade Martin to confess.[10] On the contrary, they went out of their way to try to prevent, or at least discourage, him from offering a statement. See Arizona v. Mauro, 481 U.S. 520, 528 (1987). Officer Hayes told Martin at his home that they could not discuss the fire because he had previously requested an attorney. At the station, Hayes again stopped Martin from making his "full confession to the fire" and warned that it would be improper to discuss it until his attorney was present. In the interview room, Hayes told him for a third time that he should not talk about the case. Ventigmilia testified similarly.
 
 
 28
 The absence of any interrogation preceding Martin's statement to Hayes and Ventigmilia is also supported by the fact that minutes before, Martin had made a much more incriminating, voluntary statement to the booking officer. See Taylor, 985 F.2d at 8, n. 7 (suspect made substantially same spontaneous admissions to booking officer who posed only routine booking questions). Martin told Geil: "I hurt a lot of people with this fire, I know I did. I have a lot of respect for firemen, I even wanted to be a fireman at one time."[11]
 
 
 29
 No interrogation occurred here. See, e.g., Innis, 446 U.S. at 295 (no interrogation where police officer said "there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves" and defendant then made incriminating statements); United States v. Taylor, 985 F.2d 3, 6 (1st Cir.1993) (no interrogation where police arrested and transported suspect, who said "Why is this happening to me?" and officer replied "You can't be growing dope on your property like that," and suspect then made incriminating statement); United States v. Payne, 954 F.2d 199 (4th Cir.) (no interrogation where police officer told suspect "they found a gun at your house," and suspect then made incriminating statement), cert. denied, 112 S.Ct. 1680 (1992); Endress v. Dugger, 880 F.2d 1244 (11th Cir.1989) (no interrogation where police officer who was defendant's friend visited him in jail and, when defendant began talking about the crime, advised defendant to stop talking about the crime), cert. denied, 495 U.S. 904 (1990); United States v. DeRobertis, 771 F.2d 1015 (7th Cir.1985) (no interrogation where although police had agreed to lawyer's request that defendant not be questioned, police then put suspect in cell with family member, knowing he would try to persuade suspect to confess, and gave suspect pencil and paper that defendant used to write 11-page confession); United States v. Henderson, 770 F.2d 724 (8th Cir.1985) (no interrogation where police officer said, "Well, you had the pipe and you certainly scared him. You made him fear for his safety" and defendant then made incriminating statement). We conclude that defendant's statements were freely and voluntarily offered, and that nothing functionally equivalent to interrogation occurred.
 
 
 30
 As an alternate basis for excluding the evidence, the district court found the "I want to confess" statement was so ambiguous absent a specification by Martin of the crime to which he was confessing that the statement's prejudicial effect outweighed its probative value.[12] Yet, every incriminating statement has some prejudicial effect, and here Martin's statements were not so ambiguous that they could not be given to a jury. See United States v. Nash, 910 F.2d 749 (11th Cir.1990); United States v. Pichany, 490 F.2d 1073 (7th Cir.1973).
 
 
 31
 Martin argues that he was confused about which fire the police officer was referring to when Ventigmilia stated, "I assume you called to talk about the fire." It makes little difference, since Martin's request to "confess" to either fire would likely be offered as evidence as to his involvement in the other fire in the same building. Moreover, the evidence indicates that both Martin and the police were focusing on the October fire. The surveillance of Martin did not begin in July, but instead began a day or two after the October fire; his arrest did not occur until after the October fire; and the police officers involved had nothing to do with the July investigation.
 
 
 32
 For these reasons, the district court's order suppressing Martin's statements is REVERSED and the cause is REMANDED for further proceedings consistent with the holdings contained herein.
 
 
 
 [1]
 Martin testified that he subsequently attempted to contact his attorney
 
 
 [2]
 There is no transcript of this taped conversation in the record. We know only that Martin testified that he told Gordon: "[H]ey, these police are all over me and they are going to find out who did this, and they are not going to care who they destroy or what they have to do, they are going to get to the bottom of it. They have been putting a lot of pressure on me and this reward, I know that someone is going to put the finger on me and I believe it's going to be one certain person, I wouldn't say who right now, but I believe that this particular person will put the finger on me. I know they are going to come and pick me up and take me down at any time and when they do I am not going to take anyone with me but I am not going to hold back on anything. They will find out who did it and who all is involved in it, and I suggest any time anyone goes down there to speak they better have an attorney with them."
 
 
 [3]
 Mary Margaret Braun, the police dispatcher, testified that at 10:17 p.m. on October 28, a man called, identified himself as Greg Martin, and "asked to speak to a detective concerning the fire arson on Highland."
 Similarly, Martin testified that he told the dispatcher that he wanted to speak to someone who was in charge of the fire or the arson at 1414 Highland.
 
 
 [4]
 Martin testified that he actually told Officer Geil: "I know a lot of people has [sic] been hurt over this fire, and I have always had a lot of respect for firemen."
 
 
 [5]
 Compare United States v. Smith, Nos. 93-1442, 93-1443, 93-1470, slip op. at 3 (7th Cir. Aug. 26, 1993) (lower court's underlying factual findings and its resolution of credibility should be accepted unless they are clearly erroneous, but the "ultimate issue of whether there was a custodial interrogation is a mixed question of law and fact subject to our independent review ") (emphasis added); United States v. Hocking, 860 F.2d 769, 772 (7th Cir.1988) (whether custodial interrogation occurred is a mixed question of law and fact and therefore is "independently reviewable by an appellate court") (emphasis added); with United States v. Levy, 955 F.2d 1098 (7th Cir.) (it is a mixed question of law and fact and should be reviewed under the clearly erroneous standard) (emphasis added), cert. denied, 113 S.Ct. 102 (1992)
 Other cases have found it unnecessary to decide the issue. See Schiro v. Clark, 963 F.2d 962, 974 (7th Cir.1992) (mixed question of law and fact; whether clear error is proper standard need not be resolved since the outcome is the same under either de novo or clear error review"), cert. granted on unrelated issue, 113 S.Ct. 2330 (U.S.1993); United States v. Lennick, 917 F.2d 974, 976-77 (7th Cir.1990) (need not identify a specific standard because case could be affirmed even under a de novo review); United States v. Fazio, 914 F.2d 950, 955 & n. 5 (7th Cir.1990) (need not definitively decide the issue because the findings of fact were not clearly erroneous and there was no legal error in applying the law to the facts).
 
 
 [6]
 Moreover, the district court failed to make any specific factual findings or credibility determinations which we might review on the issue of whether defendant was interrogated. When the matter of what the officers said to defendant was argued, the court stated: "I don't pay any attention--I think that has no significance." The material facts disclosed at the suppression hearing, however, are essentially undisputed. Defendant and the police officers agree on the substantive content of defendant's statements
 
 
 [7]
 In suppressing the statements, the court explained: "[F]oremost is the fact that the man was never advised of his rights when he was taken in[to] custody." The court also stated that whether defendant was advised of his Miranda rights "is the only issue in this case on that point."
 
 
 [8]
 This is not a case where the police clearly interrogated defendant and we must decide whether defendant validly waived his rights to counsel and responded to interrogation. See Edwards, 451 U.S. at 485, citing, North Carolina v. Butler, 441 U.S. 369, 372-76 (1979). Nor is it a case where defendant initiated the contact but the police then began interrogating him, such that we would need to determine if there was a valid waiver. See Edwards, 451 U.S. at 487, n. 9
 
 
 [9]
 Some cases cited herein involve the question of whether the police interrogated a suspect after he was given Miranda warnings. The basic test for custodial interrogation does not differ in the pre-Miranda context, although an unwarned defendant may be "less alert to her rights or to the risks of 'volunteered or spontaneous' admissions." United States v. Taylor, 985 F.2d 3, 9 n. 4 (1st Cir.), cert. denied, 113 S.Ct. 2426 (1993)
 
 
 [10]
 Although the perception of the suspect is key, the intent of the police may have some relevance since it "may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response." Innis, 446 U.S. at 301, n. 7. For example, if the police practice is specifically designed to elicit an incriminating response, then it is probably one that the police should have known was reasonably likely to have that effect. Id
 
 
 [11]
 Although Martin testified that he said something different to Geil, the district court ruled that the statement was admissible and thus apparently believed that this credibility question should be left to the jury
 
 
 [12]
 The court reasoned: "I want to make a confession, about what? What am I going to confess to? We don't know...." (Tr. 107)