**UNITED STATES of America**

v.

**Juan Antonio NAVARRO, Defendant**

No. CR. 02–127–PC.

United States District Court,
D. Maine.

April 4, 2003.

Peter J. Cyr, Law Office of Anthony J. Sineni, Portland, ME, for Juan Antonio Navarro.

Jonathan R. Chapman, Office of the U.S. Attorney, Portland, ME, for USA.

## ORDER AFFIRMING THE RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

GENE CARTER, Senior District Judge.

The United States Magistrate Judge having filed with the Court on March 14,

2003, with copies to counsel, his Recommended Decision on Motion to Suppress (Docket Item No. 32) in the above-entitled matter; and the time for filing objections thereto having expired without any objections having been filed; *see* 28 U.S.C. § 636(b)(1); and this Court having reviewed and considered the Magistrate Judge's Recommended Decision, together with the entire record; and having made a *de novo* determination of all matters adjudicated by the Magistrate Judge's Recommended Decision; and this Court concurring with the recommendations of the United States Magistrate Judge for the reasons set forth in his Recommended Decision, and having determined that no further proceeding is necessary; it is **ORDERED** as follows:

(1) The Recommended Decision of the Magistrate Judge is hereby **AFFIRMED**.

(2) Defendant's motion to suppress evidence is hereby **GRANTED** as to statements made after the so-called "Tommy" question and is hereby **DENIED** as to statements made before it.

## *RECOMMENDED DECISION ON MOTION TO SUPPRESS*

DAVID M. COHEN, United States Magistrate Judge.

Juan Antonio Navarro, charged with knowingly and intentionally conspiring to distribute, and possessing with intent to distribute, fifty grams or more of cocaine base in violation of 18 U.S.C. §§ 841(a)(1) and 846, seeks to suppress statements he made without benefit of warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Indictment (Docket No. 16); Defendant's Motion To Suppress Evidence Fed.R.Crim.P 12(B)(3) [sic] ("Motion") (Docket No. 23).

An evidentiary hearing was held before me on March 11, 2003 at which the defendant appeared with counsel and at the conclusion of which counsel for both the defendant and the government argued orally. I now recommend that the following findings of fact be adopted and that the Motion be granted in part and denied in part.

## I. Proposed Findings of Fact

On November 18, 2002 five individuals were arrested in Sabattus, Maine following a drug-trafficking investigation overseen by Drug Enforcement Administration ("DEA") agents Daniel Rousseau and Dan LaChance. Among those arrested were Crystal McLean and Manolin Feliz Terrero, also known as Manalo Feliz ("Feliz Terrero"). McLean became a cooperating defendant, assisting the agents with respect to the case. Feliz Terrero's preliminary examination and detention hearing was scheduled for November 25, 2002 in the magistrate judge's hearing room on the first floor of this courthouse. Rousseau and LaChance, who were present for those proceedings, were walking down the corridor toward the hearing room when they saw three Hispanic males waiting outside the hearing room. LaChance told Rousseau that a couple of the men appeared to fit descriptions that had been given of other participants in the alleged conspiracy. The agents took aside McLean, who also was in the hallway, and asked her if she could identify any of the men. She identified Navarro as "Tony" and the other two men as "Tito" and "Jorge." After some further investigation and discussion with an assistant United States attorney, LaChance and Rousseau decided to place the three suspects under arrest and apprised the United States marshals (whose facilities are across the hall from the hearing room) of the plan.

Deputy marshals effectuated the arrests with assistance from the two DEA agents. Rousseau and deputy United States marshal Thomas Folan approached Navarro in the corridor and identified themselves to him. Folan then advised Navarro he was under arrest. Navarro asked why. Rousseau replied that he was being arrested for his role in a drug conspiracy. As Folan handcuffed Navarro, Navarro protested, "You've got the wrong guy." He continued talking as he was ushered into the marshals' offices, saying things such as, "Man, don't arrest me. You can't arrest me. I can help you out. Don't put me in jail." Rousseau told him to be quiet, and he complied briefly.

Navarro was searched and placed in a holding cell in the marshals' quarters and witnessed the two other Hispanic males, Kirbin Antonio Feliz, or "Tito," and Jorge Matos, or "Jorge," each being placed in a separate holding cell. About ten minutes later, Navarro was taken to the marshals' booking room for processing. Folan, who sat behind a desk, asked Navarro personal-history questions for purposes of completion of form USM–312. Navarro sat on a stool. Also present in the processing room were Rousseau, who sat in throughout the personal-history interview and took a few notes on a yellow pad, and an unidentified deputy marshal who fingerprinted and photographed Navarro. Neither Folan nor Rousseau had any subjective intention of questioning Navarro during this particular interview about anything other than what was necessary to complete their agencies' respective personal-history forms.

As Folan began to ask personal-history questions Navarro broke down sobbing, saying something to the effect that the agents could not do this to him, he had a new baby at home, and if the agents promised he would not go to jail that day he would do anything for them. Although he was told several times to calm down, he continued on, saying words to the effect that the agents had the wrong guy, that the agents hadn't stopped "them," that "they" were sitting in Lewiston with more drugs and money right then, that this went all the way back to New York to the "Latin King" and that he (Navarro) was just the driver and interpreter. Navarro stated that the "big motherfucker" was Jorge Antonio Matos—whom Rousseau understood (or perhaps misunderstood) Navarro to refer to variously as "Matos" or "Big Tommy" or "Tony"—the "money man" who was sent up to Maine to bail out "Little Tommy."[1] Rousseau then asked (about ten minutes into the thirty to forty-five minute booking interview): "Who is Tommy?" Rousseau testified that he asked this question because he was confused—there were three or four people named "Feliz" and two called "Tony" in the case and he wanted to make sure the right people were in custody. Navarro told him Tommy was "Jancy."[2] Navarro observed Rousseau write this name down alongside the single previous word on the notepad, "Tommy." Without prompting, Navarro corrected Rousseau's spelling, advising him that "Jancy" was spelled with a "J," not an "H." Navarro then stated that Matos owned a restaurant, El Creoleo, worked for a guy named "Tommy" and

---

1. Navarro, who speaks English with a noticeable accent, testified that during the booking process he only ever referred to Matos by his full name, Jorge Antonio Matos, or by the nickname by which Matos was widely known, "Tony."

2. I spell this name phonetically inasmuch as I have been provided no other evidence of the correct spelling, apart from Navarro's testimony that it was spelled with a "J," not an "H."

that "Tommy" was a "Latin King."[3] Navarro observed Rousseau write "El Creoleo" on his notepad.[4]

After Navarro made the statements in issue he asked Rousseau whether he was going to get released. Rousseau replied that while the government would work with Navarro if Navarro would work with the government, he (Rousseau) was not in a position to make any promises. Navarro then said he had nothing further to tell Rousseau.

At no point prior to or during the booking process was Navarro read his *Miranda* rights.

## II. Discussion

■ "*Miranda* warnings must be given before a suspect is subjected to 'custodial interrogation.'" *United States v. Taylor*, 985 F.2d 3, 7 (1st Cir.1993). "'Interrogation' includes not only the asking of direct questions but also means any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* (citation, footnote and internal punctuation omitted).[5]

The area of dispute in the instant motion is narrow. The government concedes that Navarro at all relevant times was (i) in custody and (ii) never received *Miranda* warnings. Navarro testified at hearing that he could only clearly remember one question that he was asked (apart from

booking questions not here in issue): "Who is Tommy?"

■ The issues to be resolved, thus, are whether Rousseau's query regarding "Tommy" constituted interrogation for purposes of *Miranda* and, if so, the extent to which Navarro's statements must be excluded as a result. I answer the first question in the affirmative. While Rousseau credibly claims that he had no intention whatsoever of interrogating Navarro and asked the "Tommy" question only for purposes of clarifying that the right people had been arrested, he should have known that such a question was reasonably likely to elicit an incriminating response. Under the circumstances, in which Navarro was being charged with participation in a drug conspiracy and had shown eagerness to reveal knowledge of its inner workings, any question regarding the identity of a co-conspirator—particularly one described as being a kingpin of the operation—was reasonably likely to elicit further damning knowledge on Navarro's part.

■ The next and last question is the extent to which this *Miranda* violation taints the statements made. Defense counsel posited at oral argument that all statements made should be excluded on the basis that the entire scenario (lack of a *Miranda* warning, the "Tommy" question, Rousseau's presence with a notepad, Navarro's hope of cutting a deal) constituted "interrogation." I disagree. Apart from the "Tommy" question, the scenario was the usual one incident to arrest and book-

---

3. Navarro testified that Rousseau asked him a couple of additional questions about "what was going on." However, he testified that he was so stressed and upset during the booking process that he could not remember what those questions were.

4. I find that these statements concerning El Creoleo and Tommy were made after, and were in response to, the "Tommy" question.

5. Per *Miranda*, an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478–79, 86 S.Ct. 1602.

ing. Navarro's hope that he might be able to trade knowledge for freedom was unilateral; the agents did nothing to implant it in his mind.

Under the circumstances, the scope of excludable statements is narrow. Nothing said prior to the "Tommy" question is tainted inasmuch as it was uttered spontaneously and voluntarily in a transparent, desperate bid by Navarro to secure his immediate release. *See, e.g., United States v. Shea,* 150 F.3d 44, 48 (1st Cir. 1998), *recognized as abrogated on other grounds, United States v. Mojica–Baez,* 229 F.3d 292 (1st Cir.2000) ("No evidence suggests that the FBI coerced Shea into making these statements. Indeed, the record shows that all of these statements were spontaneous utterances, which we deem to be admissible."). On the other hand, statements made immediately following, and in evident response to, the "Tommy" question are excludable: that "Tommy" was "Jancy," that Matos owned a restaurant, El Creoleo, and worked for a guy named "Tommy" and that "Tommy" was a "Latin King." There is no evidence that any other statements of import were made following these utterances.[6]

### III. Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress evidence be **GRANTED** as to statements made after the so-called "Tommy" question and **DENIED** as to statements made before it.

---

**6.** I thus need not reach the thornier question of the extent to which unwarned statements volunteered by a defendant subsequent (and arguably unrelated) to a question asked in violation of *Miranda* are excludable as "fruits of the poisonous tree." *See United States v. Byram,* 145 F.3d 405, 409–10 (1st Cir.1998) ("[W]e think that [*Oregon v.] Elstad* [, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) ] does not wholly bar the door to excluding evidence derived from a *Miranda* violation—at least where the *Miranda* violation is

*NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

March 14, 2003.

not merely technical, where there is a substantial nexus between the violation and the second statement, and where the second statement is not itself preceded by an adequate *Miranda* warning.") (footnote omitted); *see also United States v. Faulkingham,* 295 F.3d 85, 89 n. 2 (1st Cir.2002) (*Byram* test "is appropriately read as an attempt to identify and evaluate the competing interests presented in the specific facts of that case, and not as creating a rigid test.").