**UNITED STATES, Appellee,**

v.

**Anthony M. SHEA, Defendant, Appellant.**

No. 97–1069.

United States Court of Appeals,
First Circuit.

Heard April 7, 1998.
Decided July 24, 1998.

---

David H. Mirsky, by appointment of the Court, for appellant.

Ben T. Clements, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief for appellee.

Before TORRUELLA, Chief Judge, ALDRICH, Senior Circuit Judge, and BOUDIN, Circuit Judge.

TORRUELLA, Chief Judge.

Defendant Anthony M. Shea appeals his four-count conviction stemming from an attempted bank robbery involving two other co-defendants, John Schurko and Nicolas Di-Martino. Schurko had pled guilty prior to trial, and Shea and DiMartino were tried together and convicted on all counts before a jury. Shea was sentenced to 382 months of imprisonment.

Shea challenges the district court's denial of his motion to suppress several statements he made after his arrest and of his motion for discovery of any rewards provided to FBI agents who were assigned to investigate him. He also claims that the district court erred in its jury instructions regarding 18 U.S.C. § 924(c), which prohibits the use and carrying of firearms during a crime of violence, and contests the sufficiency of the indictment for the § 924(c) count. Finally, the defendant argues that the government is precluded from asserting that he used and carried a certain semiautomatic weapon which the government had previously attributed to his co-defendant Schurko. We affirm.

## I. BACKGROUND

On an appeal from a criminal conviction, we summarize the facts in the light most favorable to the jury's verdict. *See United States v. González–Maldonado*, 115 F.3d 9, 12 (1st Cir.1997).

On August 11, 1995, after several days of planning, Shea, Schurko, and DiMartino attempted to rob the Wakefield Savings Bank in Wakefield, Massachusetts. Their preparations included an initial stakeout of the bank, the theft of the robbery and switch cars, and a dry run of the getaway route from the bank. At about 4:15 p.m. on August 11, Shea, wearing a Halloween mask and driving a Jeep Cherokee, with Schurko in the backseat, approached the bank. When the Cherokee was about 60 to 65 yards from the bank, several cars containing FBI agents confronted Shea, who then attempted to flee. However, Shea's car was forced into a telephone pole.

Agents removed Shea, who was carrying a police scanner and was armed with a fully-loaded Smith & Wesson revolver tucked in his pants, from the driver's seat and Schurko from the rear passenger seat of the Cherokee. In the rear seat, agents recovered a Halloween mask, an Intratec 9–millimeter semiautomatic assault weapon, which was loaded with 42 rounds of ammunition including one round in the chamber, and a magazine full of ammunition to which an additional clip full of ammunition had been attached. DiMartino, who had remained waiting in Shea's Ford Bronco at a parking area about a half mile away from the savings bank, was also apprehended by FBI agents.

Shea was charged in a three-defendant, four-count indictment with conspiracy to commit armed bank robbery under 18 U.S.C. § 371 ("Count One"); attempted bank robbery under 18 U.S.C. §§ 2113(a) & 2 ("Count Two"); use and carrying of firearms during and in relation to a crime of violence, here, attempted bank robbery, under 18 U.S.C. §§ 924(c)(1) & 2 ("Count Three"); and felon in possession of ammunition under 18 U.S.C. § 922(g)(1) ("Count Four"). While Schurko pled guilty prior to trial, Shea and DiMartino were tried together before a jury. The jury found Shea guilty of all counts, and he was sentenced to a total of 382 months of imprisonment.

## II. DISCUSSION

### A. Post–Arrest Statements

Shea contests the district court's denial of his pretrial motion requesting that the court suppress the following post-arrest utterances of Shea, which were later admitted at trial:

"How did you know I was here?"

"Where did you come from?"

"I should have gone home."

"What do you got me for, a stolen jeep?"

"What am I going to get for bank robbery, forty years? I'll be out when I'm seventy."

The basis for the suppression motion was that these statements were made while Shea was in custody but prior to his being advised of his *Miranda* rights. We review *de novo* the district court's application of *Miranda* jurisprudence to the challenged statements. *See United States v. Ventura*, 85 F.3d 708, 710 (1st Cir.1996). For the first time on appeal, Shea also objects to the admission of his responses to questions regarding his name and whether he had any weapons. As to these utterances, "we review for plain error and reverse only if an 'obvious' or 'clear' error exists that affects 'substantial rights.'" *United States v. Guerrero*, 114 F.3d 332, 341 (1st Cir.1997).

All of the statements at issue were elicited under the following circumstances. As Shea was being arrested, Special Agent Mark Little asked him his name and whether he had any weapons or needles. Shea provided his name and stated that he only had a scanner. While he was being arrested, Shea was also heard saying that he should have gone home and asking how the agents knew he was there. After Shea was secured and his guns seized, he was turned over to Special Agent Todd Richards to be transported to the FBI office. As Richards was placing Shea in the car, Shea stated: "What am I going to get for bank robbery, forty years? I'll be out when I'm seventy." On route back to the FBI office, Shea asked the agents, "What do you got me for, a stolen jeep?"

■ Law enforcement officers must inform suspects of their *Miranda* rights prior to "custodial interrogation." *See Ventura*, 85 F.3d at 710. It is essentially undisputed that Shea was in the custody of FBI agents at the time he made the challenged statements. Thus, we focus our inquiry on whether the defendant was subjected to interrogation. The Supreme Court has determined that the term "interrogation" refers not only to direct questioning, "but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). In other words, *Miranda* warnings are required "whenever a person is subjected to either express questioning or its functional equivalent." *Id.* at 300–301, 100 S.Ct. 1682.

We understand Shea's argument to be that the number of FBI agents and degree of force used to arrest Shea somehow amounted to the functional equivalent of interrogation. Therefore, Shea contends that he should have been informed of his *Miranda* rights immediately upon his arrest. We disagree.

As to the statements at issue in his motion to suppress, the defendant fails to identify any specific acts or statements by FBI agents which were "reasonably likely to elicit an incriminating response from [him]." *Innis*, 446 U.S. at 301, 100 S.Ct. 1682. No

evidence suggests that the FBI coerced Shea into making these statements. Indeed, the record shows that all of these statements were spontaneous utterances, which we deem to be admissible. *See United States v. Rogers*, 41 F.3d 25, 31 (1st Cir.1994) (affirming admission of statements that were "voluntary and spontaneous"); *United States v. Taylor*, 985 F.2d 3, 7 (1st Cir.1993) (allowing admission of statements made from conversation "spontaneously initiated" by suspect); *United States v. Voice*, 627 F.2d 138, 144 (8th Cir.1980) (finding no *Miranda* violation where officer did "no more than record defendant's spontaneous responses"). Accordingly, we affirm the district court's denial of the suppression motion.

■ We also rule that the district court did not clearly err in admitting Shea's answers to questions regarding his name and whether he had any weapons. The FBI agent's inquiry about the suspect's name falls squarely within the exception established in *Pennsylvania v. Muñiz*, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), for routine booking questions. *See id.* at 601, 110 S.Ct. 2638 (questions regarding suspect's name, address, height, weight, eye color, date of birth and current age did not qualify as custodial interrogation). Furthermore, Shea's answer to the agent's question whether he had any weapons is admissible under the public safety exception to *Miranda* established in *New York v. Quarles*, 467 U.S. 649, 659, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (finding exception to *Miranda* for "questions [by police] necessary to secure their own safety or the safety of the public").

Shea responds that the question was not motivated by a concern for public safety because Agent Little's testimony suggests that he would have searched the defendant completely regardless of Shea's answer. However, we note the context in which the question was asked: the agent had just apprehended an individual suspected of attempting to commit a violent crime, armed bank robbery. The arresting agent's question would have facilitated the securing of any weapons on Shea's person whether or not the agent intended to conduct a search of the suspect.

Finding no clear error, we affirm the admission of Shea's response.

## B. Merit Awards to FBI Agents

■ Shea asserts that the district court erroneously denied his motion for the discovery of money or rewards provided to certain FBI agents, who were assigned to investigate the defendant. Relying on *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Shea contends that since the requested information was materially exculpatory, the government violated his Fifth Amendment due process rights by failing to disclose such information. We review a district court's denial of a discovery motion for abuse of discretion. *See United States v. Phaneuf*, 91 F.3d 255, 260 (1st Cir.1996).

■ In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment...." 373 U.S. at 87, 83 S.Ct. 1194. Exculpatory evidence is "material" only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). In turn, a "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." *Id.* Shea argues that the requested information would have been relevant to show bias on the part of the government's FBI witnesses. Since the government's case depended almost completely on the testimony of these witnesses, he asserts that, if this information had been disclosed, it would have altered the jury's conviction.

The defendant has failed to articulate a theory as to how the requested information would exculpate him. The pretrial discovery motion requests that the district court "order the government to make available the amounts of money or other rewards, e.g., promotion, step raises, transfers to office of choice, *provided* to the special agents assigned to the matters pertaining to [him]" (emphasis added). It is important to note that Shea's motion does not seek information regarding awards that were contingent on any agent's testimony. In our view, the fact that FBI agents may have received merit awards for the arrest of Shea would not have changed the outcome of the trial. The jury was well aware that law enforcement officers are paid to investigate crimes and make arrests. Absent particularized allegations of agent misconduct, the most reasonable inference a jury might make from the existence of a merit award program is that Shea was a particularly dangerous suspect worthy of special attention.

■ Shea also argues that the district court's denial of his discovery motion violated his Sixth Amendment right to confront witnesses by limiting his ability to uncover witness bias. We reject this argument outright. Even without the sought-after information, defense counsel could have questioned testifying agents about this issue. Moreover, we find no evidence in the record that the district court foreclosed cross-examination by the defense on FBI merit awards. At trial, Shea's counsel asked one agent, Agent Little, whether the FBI had "a program whereby agents who make good [surveillance] pictures or get convictions, get rewarded by transfers, promotions or cash awards." The government did not object to this question. When the agent testified that he did not know because he had "never gotten one," defense counsel responded, "I can see why." The record reflects that the government objected to this last retort, and the judge properly sustained the objection. We do not adopt Shea's reading of the trial transcript that the district court, in effect, foreclosed an inquiry into FBI merit awards by sustaining this objection. Therefore, we rule that the district court did not abuse its discretion in denying Shea' discovery motion.

## C. *Pinkerton* Theory of Liability

■ Shea avers that the district court erred in instructing the jury on Count Three, which charged him with the use and carrying of firearms during and in relation to a crime of violence, here, attempted bank robbery, in violation of 18 U.S.C. § 924(c). We engage in *de novo* review of an alleged jury instruction error "involv[ing] the interpretation of

the elements of a statutory offense." *See United States v. Pitrone,* 115 F.3d 1, 4 (1st Cir.1997). The district court instructed the jury as to three alternative theories of liability on this charge: direct principal liability; aider and abettor liability; and liability for the foreseeable acts of co-conspirators in furtherance of the conspiracy, pursuant to *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). In its *Pinkerton* charge, the district court instructed the jury that it could find Shea guilty of violating § 924(c), if it found, *inter alia,* "that the defendant could *reasonably have foreseen* that the crime of using a firearm during or in relation to the attempted bank robbery might be committed by one or more of his co-conspirators" (emphasis added).

 Shea asserts that the *Pinkerton* instruction improperly permitted the jury to convict him on the § 924(c) charge without satisfying the more stringent knowledge requirement for § 924(c) aider and abettor liability. Indeed, conviction under an aider and abettor theory of liability calls for a higher *mens rea* requirement than that required for *Pinkerton* liability. In *Pinkerton,* the Supreme Court ruled that a co-conspirator may be held vicariously liable for the reasonably foreseeable substantive offenses committed by other co-conspirators in furtherance of the conspiracy. *See* 328 U.S. at 647–48, 66 S.Ct. 1180. In contrast, for aider and abettor liability to attach, the government must prove that Shea *knew* to a "practical certainty" that the principal would be using a weapon during the commission of the armed bank robbery. *United States v. Spinney,* 65 F.3d 231, 239 (1st Cir.1995). However, Shea's assertion that the more strict knowledge requirement for aider and abettor liability somehow negates the lower mens rea requirement for an alternative *Pinkerton* charge has no support in case law or common sense.

Shea's argument relies primarily on this court's decision in *Spinney.* We find *Spinney,* which reversed a defendant's conviction on a § 924(c) charge because the government failed to establish that the defendant knew to a "practical certainty" that the principal would be using a weapon during a bank robbery, *see id.,* at 239, to be inapposite. In

*Spinney,* the defendant, Jeffrey Spinney, was indicted for conspiracy to commit armed bank robbery, aiding and abetting an armed bank robbery, and aiding and abetting the use of a firearm during and in relation to a crime of violence. However, because the conspiracy count was dismissed, the district court never issued a *Pinkerton* instruction for the § 924(c) offense. Thus, in *Spinney,* we simply stated the requisite knowledge requirement for an aider and abettor theory of liability without addressing the applicability of a *Pinkerton* instruction to a § 924(c) violation.

 We agree with a number of our sister circuits that *Pinkerton* liability attaches to the use-or-carrying-of-a-firearm offense proscribed in § 924(c). *See, e.g., United States v. Wilson,* 135 F.3d 291, 305 (4th Cir.1998); *United States v. Washington,* 106 F.3d 983, 1011 (D.C.Cir.1997); *United States v. Masotto,* 73 F.3d 1233, 1240 (2d Cir.1996); *United States v. Myers,* 102 F.3d 227, 237 (6th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1720, 137 L.Ed.2d 843 (1997); *United States v. Wacker,* 72 F.3d 1453, 1464 (10th Cir.1995). We cannot "attribute to Congress an intent to punish other [violent criminal] activity where a gun is carried while exempting conspiracy, a situation that is traditionally considered more dangerous." *United States v. Díaz,* 864 F.2d 544, 548 (7th Cir.1988).

While this court has yet to address a direct challenge to the applicability of a *Pinkerton* instruction to a § 924(c) charge, we assumed its applicability in *United States v. DeMasi,* 40 F.3d 1306, 1319–20 (1st Cir.1994). In that case, the district court instructed the jury on *Pinkerton* liability for a § 924(c) charge stemming from an attempted robbery of an armored truck, but failed to include the "reasonably foreseeable" qualification to the instruction. This court found that "the use of firearms during and in relation to the attempted robbery … was part and parcel to the object of the conspiracy itself." *DeMasi,* 40 F.3d at 1319. Accordingly, the court held that "no rational jury could have found that [the defendant] conspired to rob the Brink's truck … without also finding that the use of firearms in that robbery would be reasonably

foreseeable." *Id.* at 1319–20. Thus, in *De-Masi*, this circuit sustained a § 924(c) conviction under a *Pinkerton* theory of liability. Here, we make explicit our view that a jury may be instructed on *Pinkerton* liability in connection with a charged violation of § 924(c) either as the sole or as an alternative theory of liability.

### D. Knowledge of Features of Assault Weapon

■ Shea alleges that the district court erred in failing to instruct the jury that he must have knowledge of the features of the Intratec 9–millimeter weapon which brought it within the scope of the assault weapons provision of § 924(c)(1). Section 924(c)(1) provides in pertinent part:

> Whoever, during and in relation to any crime of violence ... uses or carries a firearm, shall ... be sentenced to imprisonment for five years, and *if the firearm is a* short-barreled rifle, short-barreled shotgun, or *semiautomatic assault weapon, to imprisonment for ten years,* and if the firearm is a machine-gun, or a destructive device, or is equipped with a firearm silencer or muffler, to imprisonment for thirty years.

18 U.S.C. § 924(c)(1) (emphasis added). The defendant argues that the semiautomatic assault weapon clause of this section is a separate offense, which requires the jury to make a finding that Shea knew of the gun's features. Shea presents a question of first impression for this circuit.

■ We rule that the assault weapon provision is not an element of the § 924(c)(1) offense, but instead, a sentencing enhancement. "When deciding how a particular statutory allusion should be construed, an inquiring court must mull the language and structure of the statute, and, when necessary, its legislative history." *United States v. Rivera–Gómez,* 67 F.3d 993, 1000 (1st Cir. 1995) (finding "death results" provision of 18 U.S.C.. § 2119(3) to be sentence enhancer rather than separate offense). The language and structure of § 924(c)(1) suggest that Congress intended the assault weapon clause to serve as a sentence enhancer. The section begins by criminalizing the use and carrying of a firearm during the commission of a predicate offense, a crime of violence, and establishes a base sentence of 5 years for a violation. The weapons clauses that follow, including the assault weapon provision, are not structurally independent, but rather are integrated into the main use-and-carrying offense. "Ripped from their textual moorings, [these clauses] would be little more than gibberish...." *Rivera–Gómez,* 67 F.3d at 1000.

■ Traditional indicia that a provision is a sentence enhancer include an explicit reference to a prior conviction under the statutory section at issue; special sentencing procedures; a penalty which is a multiplier of the sentence for the underlying crime; or a title denoting it as a sentence enhancer. *See United States v. Rumney,* 867 F.2d 714, 718 (1st Cir.1989). The 10–year sentence for using and carrying an assault weapon (as well as the 30–year sentence under the machine-gun provision) are multipliers of the 5–year base sentence, providing further evidence of congressional intent to enhance sentences under certain aggravating circumstances.

The statute's legislative history confirms our interpretation of the section. Congress initially created § 924(c) without distinguishing among types of firearms. *See United States v. Branch,* 91 F.3d 699, 739 (5th Cir. 1996) (citing Gun Control Act of 1968, Pub.L. No. 90–618, § 102, 82 Stat. 1213 (1968) (prohibiting use or carrying of "firearm" during commission of "any felony")). Then, in 1986, Congress added the machine-gun clause to the statute. *See* Firearms Owners' Protection Act, Pub.L. No. 99–308, § 104, 100 Stat. 449, 456 (1986). "Noticeably absent from both the House Report and floor debates [accompanying the 1986 Act] was any discussion suggesting the creation of a new offense." *Branch,* 91 F.3d at 739. In 1990, Congress appended the short-barreled rifle, short-barreled shotgun and destructive device provisions to the section, again without evincing an intent to create new offenses for these weapons. *See* Crime Control Act of 1990, Pub.L. No. 101–647, § 1101, 104 Stat. 4789, 4829 (1990). Finally, the semiautomatic assault weapon clause was added in 1994 to the list of weapons in § 924(c)(1) without

creating a separate section. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, § 110102(c)(2), as amended, Pub.L. No. 104–294, § 603(p)(1), 108 Stat. 2015 (1994).

Shea asserts that *Staples v. United States,* 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), in which the Supreme Court held that the government needs to prove knowledge of the type of firearm for a conviction under 26 U.S.C. § 5861(d), compels us to make a similar determination for § 924(c)(1). However, we can easily distinguish the situation in *Staples* from the present case because, unlike § 924(c)(1), the statute in *Staples* prohibited possession of certain types of firearms but was silent as to the mental state required for the commission of the offense. As the Eleventh Circuit noted in *United States v. Brantley,* 68 F.3d 1283, 1289 (11th Cir.1995), the *Staples* court wished to avoid dispensing with a *mens rea* requirement "where doing so would 'criminalize a broad range of apparently innocent conduct.'" *Id.* at 1289 (quoting *Staples,* 511 U.S. at 609, 114 S.Ct. 1793). Such concerns are absent here because "the § 924(c) defendant whose sentence is enhanced based on the type of weapon he carried has demonstrated a 'vicious will' by committing the principal offense." *Brantley,* 68 F.3d at 1290. Accordingly, we reject Shea's argument that a conviction under the statute required the government to prove knowledge of the features of the Intratec 9–millimeter weapon.

Shea also argues that the district court's imposition of a 10–year sentence for the § 924(c) violation constituted a constructive amendment to the original indictment because the indictment failed to charge the assault weapon in Count Three either directly or by incorporation. This argument rests entirely upon the assumption that the assault weapon clause creates a separate offense. Having determined that the clause acts as a sentence enhancer, *see supra,* we reject Shea's constructive amendment claim without further comment.

**E. Judicial Estoppel**

 Shea alleges that the government is judicially estopped from asserting that he used or carried the Intratec 9–millimeter weapon because during the detention hearing of his co-defendant Schurko, the government linked the gun to Schurko rather than to Shea. At Schurko's detention hearing, the government stated in closing argument that, "[t]he notion ... that somehow that gun should be linked to Shea, who was in the front seat, rather than [Schurko], who was sitting on it when he was arrested, is simply absurd." As this court observed in *United States v. Kattar,* 840 F.2d 118 (1st Cir.1988),

> The doctrine of judicial estoppel ... prevents a party from asserting a position contrary to the position taken by the party in an earlier proceeding. In this circuit, the doctrine is only applied when a litigant is "'playing fast and loose with the courts.'"

*Id.* at 129–30 n. 7 (citations omitted). We choose not to apply this "obscure doctrine," *id.* at 130 n. 7, here. The government's closing argument at Schurko's detention hearing is not inconsistent with its position in the prosecution of Shea where it pursued accomplice as well as principal theories of liability for the use and carrying of the Intratec 9–millimeter weapon. Therefore, we see no ground for reversal on this point.

**III. CONCLUSION**

For the foregoing reasons, we ***affirm*** the defendant's conviction.