Robert Anthony BEARSE,
Pro Se, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. Civ.A. 98–11717–PBS.

United States District Court,
D. Massachusetts.

Jan. 19, 2001.

Robert A. Bearse, Central Falls, RI, for petitioner.

Thomas C. Frongillo, Emily R. Schulman, United States Attorney's Office, John A. Wortmann, Jr., Boston, MA, for respondent.

## MEMORANDUM AND ORDER

SARIS, District Judge.

## I. INTRODUCTION

*Pro se* Petitioner Robert Anthony Bearse brings this habeas petition pursuant to 28 U.S.C. § 2255 to set aside his conviction for conspiracy to import and for importation of cocaine. He advances five claims: (1) that his guilty plea was coerced by threats and promises made by government agents in the absence of defense counsel before his plea colloquy; (2) that the government breached the plea agreement by failing to file a motion pursuant to U.S.S.G. § 5K1.1; (3) that his Sixth Amendment right to counsel and right to receive effective assistance of counsel were violated when government debriefings were conducted without the presence of defense counsel; (4) that his attorney failed to file a notice of appeal despite instructions to do so; and (5) that the government withheld exculpatory evidence prior to the plea. After an evidentiary hearing, the petition is *DENIED.*

## II. BACKGROUND

Based on the evidentiary hearing on January 10, 2001, the affidavits, the transcripts of prior proceedings, and other submissions, the Court finds as follows:

### a. *The Arrest*

On May 14, 1995, United States Customs agents stopped Petitioner Bearse, Michael Wainwright, Wanda Dougherty (Petitioner's sister), and Douglas Bearse (Petitioner's brother) as they re-entered the United States from a trip to Jamaica. During a search of Wainwright's luggage, agents uncovered three bottles of liquor containing dissolved cocaine. The agents arrested Petitioner and his companions. On June 22, 1995, Petitioner was charged with conspiracy to import cocaine and importation of cocaine in violation of 21 U.S.C. §§ 952, 963. Petitioner pleaded not guilty.

### b. *The Plea Agreement*

On October 3, 1995, Petitioner met with Customs agents and several Assistant United States Attorneys to discuss a possible plea bargain. Petitioner was represented by counsel, Mr. Thomas Murray, Esq. After discussing his options with counsel, Petitioner informed the government that he would not negotiate a plea or cooperate and that he intended to go to trial. The meeting was then terminated, and defense counsel left the building.

Special Agent James Scott and Special Agent William Flanagan from the United States Customs Service escorted Petition-

er from the U.S. Attorney's Office back to the holding cells in the U.S. Marshal's Office on the fifteenth floor of the old federal courthouse building at Post Office Square in Boston, Massachusetts. En route, a discussion occurred. Although Scott testified at the evidentiary hearing that he had no memory of any conversation with Bearse, Flanagan remembered that Bearse asked Scott what was going to happen next. Flanagan recalled that Scott told Bearse that his trial would proceed as scheduled, at which point Bearse appeared confused. Bearse then informed the agents that he did not necessarily want to go to trial, that there had been a misunderstanding, and that he wanted to speak with his lawyer.

Bearse remembered things differently. He testified that on his return trip to the U.S. Marshal's Office, he was taken to a stairwell near the elevator, where the U.S. Customs Agents told him that he should not go to trial because he was looking at a life sentence, that he should consider his wife and children, and that if he changed his mind they would recommend a sentence of under five years imprisonment or possibly probation for the cooperation. According to Bearse, the agents also promised that they would dismiss the charges against his sister and Wainright. I find that Flanagan's version was the most credible of the three. (Def.Ex.1).

After defense counsel returned to the building, Petitioner was escorted back to the conference room where defense counsel negotiated a plea and cooperation agreement with the government. Flanagan remembers that Bearse met alone with this attorney in the conference room prior to these plea negotiations. In contrast, Bearse claims that he did not have a private meeting with his lawyer, but concedes that he did not press for one. In any event, defense counsel was present during the plea negotiations when Petitioner returned to the conference room. Petitioner signed the agreement dated October 2, 1995.

At the Rule 11 hearing, held on October 3, 1995, the Court asked Petitioner a series of questions:

THE COURT: Has [counsel] made any representations to you about what I will do as far as the sentence?

THE DEFENDANT: I didn't understand that.

THE COURT: In other words, has he made you any promises as to what sentence I will impose?

THE DEFENDANT: No.

THE COURT: All right. In any way do you feel as if he's coercing you into pleading guilty?

THE DEFENDANT: No.

THE COURT: Has anyone made any promises or threats to you?

THE DEFENDANT: No.

THE COURT: Have you had a chance to read through with him the plea agreement?

THE DEFENDANT: Yes, I have.

. . .

THE COURT: And do you understand that there are no promises or representations from the government apart from the plea agreement?

THE DEFENDANT: Yes.

Rule 11 Hr'g Tr. at 5–6. After the Court found the plea was knowing and voluntary, the case was continued for sentencing.

c. *Sentencing*

Two years later, on September 3, 1997, after several motions for continuance, Petitioner was sentenced to 188 months in prison. The government declined to file a motion pursuant to U.S.S.G. § 5K1.1 primarily because AUSA Emily Schulman be-

lieved that Bearse would not be a credible witness in the trial of alleged co-conspirator Joseph Bey before Judge Keeton. While there were several reasons for the conclusion, the "straw that broke the camel's back" (Ms. Schulman's words) involved an incident in prison. Apparently, Petitioner told a prisonmate, a major drug trafficker, that he kept cash in a bank account in Jamaica under the code name "Jordan." The prisonmate-turned-snitch told the government of Petitioner's assertions. When AUSA Schulman confronted Bearse with the allegations, Petitioner at first lied and then admitted the statement, claiming that the statement was mere braggadocio and untrue. Unable to ascertain whether Petitioner really had this offshore account of drug proceeds, and convinced Bearse was not a credible witness, the government informed Bearse that it would not use his testimony at the Bey trial and would not, therefore, file a motion pursuant to U.S.S.G. § 5K1.1 recommending a downward departure for Bearse's sentence on the basis of substantial assistance.

During the sentencing hearing, defense counsel told the Court that Defendant intended to move to vacate his six state court convictions which served as the predicates for his career offender status. Defense counsel had not taken this tack earlier, because he expected the government to file the substantial assistance motion. With respect to the state court convictions, the Court stated: "I mean, if at some point you come up with records that show that these weren't—that you have fewer than two prior convictions, then you will come back to me within the course of the next year." (Disposition Tr. at 10). The Court also informed Defendant that he had the right to appeal the sentence within ten days of entry of judgment. No appeal was filed.

d. *The Aftermath*

Bearse's relations with defense counsel soured. On December 24, 1997, Petitioner wrote counsel the following letter:

DEAR MR. MURRAY

SIR. THIS WILL BE MY "LAST AND FINAL REQUEST TO YOU", AS TO THE FACTS STATED HEREIN:

I'VE BEEN TRYING FOR months BY PHONE AND LETTERS TO YOUR OFFICE TO "NO AVAIL"!

SIR: YOU, YOUR SELF TOLD ME THAT WE HAD ONE YEAR TO DO MY APPEAL AND NOT TO WORRY ABOUT IT, thats ALL YOU EVER TOLD ME FROM DAY ONE; AND NOW I WONDER IF YOU EVEN FILE A NOTICE OF APPEAL ON TIME? AS REQUIRED WITHIN THE 10 DAYS AFTER SENTENCING; AS YOU SAID YOU'D DO, I, FEEL YOU SHOULD HAVE HAD IT DONE AND FILE IT AT THE TIME OF SENTENCING, SO ALL I EVER HEARD OUT OF YOUR MOUTH, (IS DON'T WORRY ABOUT IT), AN I'M NOW MORE THAN THEN WORRY ABOUT IT SIR. AS I LOOK BACK UPON THIS CASE THAT YOU JUST TOOK THE MONEY AND RUN, THAT YOU HAD TOO MANY THINGS GOING ON IN YOUR LIFE TO WORRY ABOUT ME AND MY FAMILY.

1. LIKE THE TIME I CALLED YOU AT YOUR HOME, ONLY TO FIND OUT THAT YOUR WIFE HAD KICKED YOU OUT, FOR PLAYING AROUND WITH SOME OTHER WOMEN AND SHE TOLD ME ABOUT YOUR GAMBLING PROBLEM AND A LOT MORE.

2. I'VE ASKED AND ASKED YOU BY LETTERS TO SENT ME COPIES OF THE APPEAL AND OTHER DOCUMENT'S AS LISTED HEREIN BE-

LOW, TO SEE IF YOU HAVE DONE YOUR JOB? AS I HAVE THIS FEELING YOU HAVE (NOT); FROM WHAT I'VE LEARN ABOUT YOU, SIR. YOU HAVE CHANGE JOB THREE TIME'S AND THE TIME YOU WAS DOING MY CASE AND THERE ARE MANY OTHER FACT'S THAT WE NEED NO GO INTO AT THIS TIME, BUT IF, I, DO NOT GET COPIES OF ALL MY DOCUMENTS WITHIN THE NEXT (30) DAYS, I WILL WRITE THE HON: JUDGE P.B.S., THERE AFTER SIR.

3. THIS IS THE MAIN REASON I'M SENDING THIS CERTIFIED TO YOUR OFFICE, AS YOU'VE HAVE NOT DONE A THING I'VE ASKED YOU OR YOUR OFFICE TO RELAY TO YOU!

On January 19, 1998, defense counsel responded:

Dear Robert,

In my over twenty years of practicing criminal defense, I have never received such an insulting factually inaccurate and obviously deranged letter. As a direct result, I am terminating our relationship and will be filing a Motion to Withdraw as counsel for all purposes. First of all to suggest that I have no responded to your phone calls is ludicrous. I think the secretaries who worked at Cuddy Bixby and Denner, at Lane Altman and Owens, and at my present office will attest to the hundreds of phone calls I have taken from you, and that they have taken in my absence. (The latter included arranging for you to speak with your wife on numerous occasions).

As I explained in great detail on several occasions, we are not taking a direct appeal to the First Circuit. We are planning to seek post-conviction relief. While you are correct that if we *had* planned to appeal, we would have had ten days to file the Notice, we have one year to file the collateral attack.

One of your most ridiculous statements is regarding your telephone call to my house. By coincidence I was sitting with my wife when you called, and I heard her tell you I didn't live there anymore. This was because she didn't want you calling the house whenever you got the whim. No, she didn't kick me out; there were no other women, and the last time I think I bet on anything was the Boston College—University of Miami football game in 1987, when Doug Flutie completed the famous Hail Mary pass to win. Once again, your overactive imagination, or delusions have caused you to misperceive reality. This is the same reason that the U.S. Attorney's office has elected not to have you testify—they simply cannot vouch for your credibility. Certainly your wild assertion to your fellow inmate that you had stashed $250,000 in a secret account did not help.

You were sent copies of your P.S.I. on two occasions while you were at Wyatt. Similarly, you were provided a copy of the plea agreement long before you signed it.

For your information, I am a member in good standing of the Florida Bar and have been since 1976. In that time I have never been reprimanded or suspended. If you keep making these totally unfounded allegations about me, I will be forced to seek legal action.

Robert, the decision for me not to attend the sessions with Customs and the U.S. Attorney was a mutual one. I recall you even stated that since you were only going to be telling the same story over again, and it was the truth, you didn't need me there.

Robert, you have never asked me for DEA or any other report. If you had, you would have received them forthwith. All documents I believe are at Lane Altman & Owens, and I would be happy to find them for you.

You know why the pre-plea agreement with the U.S. Attorney has hit an impasse, and you know that you have only yourself to blame. Your anger and frustration are misdirected.

As a final matter, and perhaps the most convincing evidence that you are having difficulty with the truth is your allegation that I "took the money and run" (sic.)

If I recall, your family paid a grand total of $1,000 to the firm Cuddy Bixby, with the promise to pay much more. They defaulted on that promise and the last time I saw a bill in your case it had exceeded $40,000. I have never received a dime from you or your family. I strongly suggest that you ask the Court to appoint another lawyer to represent you from here on in. Good luck.

> Sincerely,
>
> Thomas G. Murray

With the assistance of an attorney from the Committee on Public Counsel Services, Defendant pursued efforts to vacate the state court convictions. He met with no success. On August 17, 1998, Bearse filed the petition for habeas corpus, including the claim that defense counsel refused to file a notice of appeal despite instructions to do so. Pursuant to a procedural order issued by this Court, defense counsel Thomas G. Murray submitted an affidavit, stating:

> 4. Following this sentence Mr. Bearse and I discussed the efficacy of appealing. Mr. Bearse agreed that any such appeal would be fruitless. Instead, Mr. Bearse was interested in pursuing Motions for New Trial in the state court, in the hopes that this would reduce his sentencing guidelines score for criminal history. I told him that given the number of state cases involved, and the minimal chance of success, I would be reluctant to pursue that avenue on his behalf. I did suggest, however, that he contact CPCS for a court appointed lawyer.

(Murray Aff. ¶ 4.)

An evidentiary hearing was scheduled, and continued several times due to Mr. Murray's mortal illness. Unfortunately, he died before an evidentiary hearing was held. At the evidentiary hearing before this Court, Petitioner testified that he did discuss with Murray the advisability of an appeal. Bearse's memory is that he instructed Murray to appeal. However, based on the record, I find that Murray and Bearse agreed that the best approach was to vacate the state court convictions, not to file a direct appeal. I base this conclusion on Murray's letter and affidavit, which are consistent on the point. The letter is particularly compelling because it was written prior to the filing of the habeas petition. While Bearse is quite insistent that he instructed Murray to file a direct appeal, his early pro se pleadings in this Court suggest confusion on the part of Mr. Bearse. He apparently believed, for example, that I had instructed defense counsel to appeal. Bearse's August 1998 affidavit criticizes Murray on the ground that Murray "failed to file a direct appeal, even after having been ordered by the Honorable Court to do so ASAP. Petitioner had also asked Attorney Murray to file the direct appeal within ten days, to which Attorney Murray responded that I shouldn't worry about it and that he had up to a year to file the appeal." (Bearse Aff. at 1.) After reviewing the transcript of the disposition at the evidentiary hearing, however, Petitioner admitted that he might have been confused at the sentenc-

ing hearing. I find that Bearse did not instruct Murray to file a direct appeal within the ten days.

## III. DISCUSSION

### Standard of Review

■ Section 2255 provides post-conviction relief if a petitioner's sentence (1) was imposed in violation of the Constitution; (2) was imposed by a court that lacked jurisdiction; (3) exceeded the statutory maximum; or (4) was otherwise subject to collateral attack. *David v. United States,* 134 F.3d 470, 474 (1st Cir.1998); 28 U.S.C. § 2255. Collateral attacks under this fourth category must "reveal fundamental defects which, if uncorrected, will result in a complete miscarriage of justice...." *David,* 134 F.3d at 474 (internal quotation marks and alteration omitted) (quoting *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)).

### Claim 1: Plea

Petitioner makes two arguments: that his plea was involuntary because Agent Scott's threats and promises during the stairway incident undermined the voluntariness of his plea; and that his plea was involuntary as a matter of law, because it was solicited in violation of his Fifth and Sixth Amendment rights to counsel. Both arguments fail.

■ A guilty plea, made voluntarily and intelligently by a person advised by competent counsel, may not be collaterally attacked. *Mabry v. Johnson,* 467 U.S. 504, 508, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984) (denying a writ of habeas corpus to a petitioner who, served by competent counsel, voluntarily and intelligently entered a plea agreement and understood its consequences); *Boykin v. Alabama,* 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); Fed.R.Crim.P. Rule 11(c). A

Rule 11 hearing is "designed to ensure that defendants who enter guilty pleas do so with full understanding of the nature of the charge and the consequences of their plea." *United States v. Noriega–Millan,* 110 F.3d 162, 166 (1st Cir.1997) (citations and internal quotation marks omitted); *Carey v. United States,* 50 F.3d 1097, 1098 (1st Cir.1995) (same). As important, it is designed to "produce a complete record of the factors relevant to that determination [of voluntariness] so as to eliminate any need to resort to later factfinding proceeding in this highly subjective area." *United States v. Marrero–Rivera,* 124 F.3d 342, 348 (1st Cir.1997) (internal quotation marks omitted); *Noriega–Millan,* 110 F.3d at 166 (noting that "[c]ompliance with Rule 11's procedures enables the district court to determine for itself the voluntariness of the plea" during post-conviction proceedings (citation omitted)).

■ As a result, "it is the policy of the law to hold litigants to their assurances" at a plea colloquy. *Marrero–Rivera,* 124 F.3d at 349 (citations, internal quotation marks, and alteration omitted). A petitioner "should not be heard to controvert his Rule 11 statements in a subsequent § 2255 motion unless he offers a valid reason why he should be permitted to depart from the apparent truth of his earlier statement[s]". *United States v. Butt,* 731 F.2d 75, 80 (1st Cir.1984).

■ Bearse assured the Court under oath during his Rule 11 hearing that no promises or threats had been made apart from the plea agreement. He has not presented any reason why the Court should find his current allegation of coercion credible, particularly in light of Agent Flanagan's testimony, Petitioner's statements in Court, and Petitioner's failure to raise the issue in his letter to counsel. After an evidentiary hearing, I find that no

threats or promises were made on October 2, 1995 in a stairwell.

█ Even assuming the truth of Bearse's allegations, I conclude that these statements did not in fact undermine the voluntariness of his plea for three reasons. First, nothing in the record suggests that the Customs agents made any material misrepresentations. Bearse was facing a forty-year maximum sentence if he went to trial. While Bearse alleges that there was a threat that he faced a life sentence, it is unlikely that the discrepancy between 40 years and life is material in this context. Moreover, the agents' alleged promise of a recommendation of leniency, even if the basis of Bearse's plea, could not have rendered the plea involuntary. *Bordenkircher v. Hayes,* 434 U.S. 357, 363, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) (finding that a plea induced by promises of a recommendation of a lenient sentence is not "involuntary in a constitutional sense simply because it is the end result of the bargaining process"). Second, after the incident, Bearse had the opportunity to meet with his attorney to discuss the potential sentencing consequences of a guilty plea. This eliminated any taint.

█ Third, generally speaking, § 2255 does not provide relief for constitutional offenses that occur *prior* to the plea colloquy. *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973) (holding that "a guilty plea represents a break in the chain of events … [such that] [the defendant] may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea"); *United States v. Cordero,* 42 F.3d 697, 698 (1st Cir.1994) (noting that the First Circuit has "assiduously followed the letter and spirit of *Tollett,* holding with monotonous regularity that an unconditional guilty plea effectuates a waiver of any and all non-

jurisdictional lapses that may have marred the case's progress up to that point. …"); *Acevedo–Ramos v. United States,* 961 F.2d 305, 308 (1st Cir.1992), *cert. denied,* 506 U.S. 905, 113 S.Ct. 299, 121 L.Ed.2d 222 (1992).

### Claim 2: Failure to Move for Downward Departure

Petitioner argues that the government breached his written plea agreement by refusing to move for a downward departure pursuant to U.S.S.G. § 5K1.1, and asks that the Court downwardly depart to fulfill the agreement. *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) (holding that "when a plea rests in any significant degree on a promise or an agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."); *Bemis v. United States,* 30 F.3d 220, 221 (1st Cir.1994) (holding that a habeas corpus petition is "an appropriate procedural vehicle for advancing" a claim of breach of plea contract, also known as a "Santobello claim").

█ It is true that the government refused to move for downward departure under § 5K1.1. As a general matter though, such refusal is the government's prerogative, subject only to judicial review for constitutionally improper motives or irrationality. *Wade v. United States,* 504 U.S. 181, 185, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992) (noting that § 5K1.1 "gives the Government a power, not a duty, to file a motion when a defendant has substantially assisted" and holding that the government's refusal to file a § 5K1.1 is reviewable only for constitutionally impermissible prejudice or irrationality); *United States v. Catalucci,* 36 F.3d 151, 154 (1st Cir. 1994) (applying *Wade* and holding that a petitioner has no automatic right to an evidentiary hearing on the government's

refusal to recommend a downward departure, "absent some threshold showing that [a hearing] would likely be useful"). There is no evidence of unconstitutional prejudice or irrationality. The government explained that it did not file a motion because Petitioner's credibility was so impaired that the government could not use him as a witness. This is a good-faith, rational explanation in light of Petitioner's fabrication regarding the elusive overseas drug account.

### Claims 3 & 4: Ineffective Counsel

▓ Petitioner claims that Mr. Murray rendered ineffective assistance of counsel. The United States Supreme Court established a two-part test for determining ineffective assistance of counsel in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish ineffective assistance, Petitioner must show "(1) that [counsel's] performance fell below an objective standard of reasonableness and (2) that prejudice resulted." *Tejeda v. Dubois,* 142 F.3d 18, 22 (1st Cir.1998) (restating *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052); *see also Hill v. Lockhart,* 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (applying the *Strickland* test to challenges to guilty pleas based on ineffective assistance of counsel). The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland,* 466 U.S. at 669, 104 S.Ct. 2052, and consider "the totality of the circumstances" before it, *Perron v. Perrin,* 742 F.2d 669, 674 (1st Cir.1984), when doing so. *Accord Lema v. United States,* 987 F.2d 48, 51 (1st Cir.1993).

▓ First, Petitioner claims that Mr. Murray's conduct during governmental debriefings fell below the threshold of rea-

sonableness, because Mr. Murray failed to appear at post-plea debriefings, despite repeated calls, and was tardy. However, Petitioner admits he waived counsel's presence at the first debriefing. Agent Flanagan testified that Petitioner never sought counsel, though the opportunity to call Mr. Murray was offered to Bearse at every meeting. in addition, Agent Scott testified that Bearse actually proactively called Scott to give information. Murray recalled that it was a mutual decision that he need not attend the debriefings. Mr. Murray stated, "The decision for me not to attend the sessions with Customs and the U.S. Attorney was a mutual one. I recall [Petitioner] even stated that since [he was] only going to be telling the same story over again, and it was the truth, [he] didn't need me there." (Letter from Murray to Bearse of 1/19/98, at 2.) In these circumstances, I conclude that counsel acted reasonably in not attending subsequent briefings.[1]

▓ Even if Petitioner could establish the first prong of the *Strickland* test, he fails to establish prejudice. There is no showing that counsel's presence at debriefings would have affected the government's position on § 5K1.1, which was motivated by the prison incident, not the degree of cooperation.

▓ Second, Petitioner claims that defense counsel was ineffective for failing to file a notice of appeal although he was instructed to do so. After the evidentiary hearing, I find that Mr. Murray met with Bearse after the sentencing, they discussed the possibility of appeal, and Bearse decided to pursue the alternative of attacking the state court convictions. Accordingly, I conclude that Murray did not act in a professionally unreasonable man-

---

1. Bearse also alleges that the uncounseled debriefings violate his Sixth Amendment right

to counsel. However, Petitioner's waiver resolves this claim as well.

ner. *Roe v. Flores-Ortega*, 528 U.S. 470, 477–79, 120 S.Ct. 1029, 1035, 145 L.Ed.2d 985 (2000) (holding that where counsel has consulted with defendant, "[c]ounsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal.").

### Claim 5: Brady Violation by the Prosecution

Petitioner argues that the prosecution improperly withheld exculpatory evidence from him prior to his change of plea: specifically, a trip itinerary and four rolls of undeveloped film.

 In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment...." *Accord United States v. Shea*, 150 F.3d 44, 49 (1st Cir.1998) (quoting *Brady*, 373 U.S. at 87, 83 S.Ct. 1194), *cert. denied*, 525 U.S. 1030, 119 S.Ct. 568, 142 L.Ed.2d 473 (1998). Exculpatory evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Ciocca*, 106 F.3d 1079, 1082 (1st Cir. 1997) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). A "reasonable probability," in turn, is one that is "sufficient to undermine confidence in the outcome." *Shea*, 150 F.3d at 49.

Courts have split on the issue of whether under *Tollett* a petitioner, having entered a guilty plea, may challenge a *Brady* violation that preceded the guilty plea. *Indelicato v. United States*, 106 F.Supp.2d 151, 155–56 (D.Mass.2000) (describing the Circuit split).

Petitioner argues that his itinerary and film would have established the legitimacy of his trip to Jamaica, but the government provided a letter showing that it produced these items. With respect to the other alleged defects, the government pointed out that it had no plea agreement with Michael Wainwright and had not yet arrested John Moore at the time of the plea.

### IV. ORDER

Petitioner's motion for relief under 28 U.S.C. § 2255 is **DENIED.**